UNITED STATES, Appellee

v.

Sergeant First Class Michael
W. PLEASANT, Jr., United
States Army, Appellant.

ARMY 20100781.

U.S. Army Court of Criminal Appeals.

26 Dec. 2012.

**710**

For Appellant: Major Richard E. Gorini, JA (argued); Colonel Patricia A. Ham, JA; Lieutenant Colonel Imogene M. Jamison, JA; Major Richard E. Gorini, JA; Captain Meghan M. Poirier, JA (on brief).

For Appellee: Captain Kenneth W. Borgnino, JA (argued); Major Amber J. Roach, JA; Major Katherine S. Gowell, JA; Captain Kenneth W. Borgnino, JA (on brief).

Before KERN, YOB, and ALDYKIEWICZ, Appellate Military Judges.

## OPINION OF THE COURT

ALDYKIEWICZ, Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of attempted larceny and larceny in violation of Articles 80 and 121, Uniform Code of Military Justice, 10 U.S.C. §§ 880, 921 (2006) [hereinafter UCMJ]. The panel sentenced appellant to a bad-conduct discharge, confinement for twenty-four months, forfeiture of all pay and al-

lowances, and reduction to the grade of E–1. The convening authority approved only so much of the sentence as provided for a bad-conduct discharge, confinement for eleven months, and reduction to the grade of E–1.[1]

## I. BACKGROUND

Appellant's larceny and attempted larceny charges relate directly to appellant's misuse and manipulation of the military supply system in Iraq. Using his position as unit supply sergeant for the Baghdad Operations Command Advisory Team (BOCAT), appellant requisitioned an estimated $385,000.00 of non-mission-essential, military property using the military supply system, property that included high-dollar value power tools used for construction as well as military equipment. Approximately $67,000.00 worth of requisitioned property was recovered in appellant's North Carolina home. Property of an approximate value of $12,000.00 was recovered in the North Carolina home of appellant's co-accused, the BOCAT Deputy Chief, Lieutenant Colonel (LTC) Timothy Lethers.[2]

The BOCAT, for all practical purposes, acted as the headquarters detachment for appellant's unit, the 18th Fires Brigade (Forward) out of Fort Bragg, North Carolina. The BOCAT was located at Forward Operating Base (FOB) Prosperity, Iraq, and consisted of approximately forty to fifty soldiers, reaching a total population of seventy-five personnel at its peak. The BOCAT was led by a colonel who acted as the BOCAT Chief, and LTC Lethers served as the BOCAT Deputy Chief. The detachment commander, Captain (CPT) BJ, managed BOCAT daily operations. The BOCAT's mission was to advise and support the Iraqi Baghdad Operations Command (BOC) group, as well as act as liaison between the BOC and Multi–National Division–Baghdad (MND–B). With the exception of one construction project,

---

1. Both the automatic and adjudged forfeitures were deferred until action. At action, the convening authority disapproved the adjudged forfeitures and waived the automatic forfeitures for a period of six months, with direction that they be provided to appellant's spouse. In addition, appellant was credited with thirteen days of confinement against the sentence to confinement.

2. Lieutenant Colonel Timothy Lethers was convicted, contrary to his pleas, by a military judge sitting as a general court-martial of larceny of military property on divers occasions, charges stemming from the same facts and circumstances surrounding appellant's charges. The court sentenced LTC Lethers to eleven months' confinement.

which was handled by MND–B engineers from the 4th Infantry Division, the BOCAT had no construction mission and no missions requiring power tools.

Appellant's primary duty at the BOCAT was conducting personal security missions in the BOCAT's personal security detail (PSD). In addition to his PSD duties, the detachment commander assigned appellant two additional duties: (1) primary BOCAT Supply Noncommissioned Officer (NCO) (i.e., supply sergeant), and (2) BOCAT pay agent.

As the BOCAT supply sergeant, appellant had the authority to requisition military property through Supply Support Activities (SSAs) in Iraq using the Department of Defense Activity Address Code (DODAAC) assigned to the BOCAT.[3] From October 2008 through May 2009, appellant requisitioned supplies and property, including large power tools and construction-related equipment. The requisitions were submitted to the SSA at FOB Prosperity on Department of the Army Form 2765, and absent errors on the DA Form 2765, were processed by the SSA at FOB Prosperity through to the SSA at Camp Liberty. The SSA at Camp Liberty filled the orders and delivered the property to the SSA at FOB Prosperity to be picked up. On average, appellant went to the FOB Prosperity SSA two to three times per week ordering and picking up property.

In April 2009, in anticipation of the redeployment of the 18th Fires Brigade (Forward) soldiers back to Fort Bragg, BOCAT personnel, to include appellant, loaded two large shipping containers with personal equipment and gear that BOCAT soldiers no longer needed in theater. The two shipping containers traveled from FOB Prosperity, Iraq, back to Fort Bragg, North Carolina, where, in May of 2009, they were stored in the motor pool.

In June 2009, appellant coordinated with Sergeant First Class (SFC) DW to gain access to the two containers, advising SFC DW that he needed to gain access to the shipping containers to recover his "personal gear." No mention was ever made of removing any military property. After borrowing a trailer from SFC DW, appellant cut the steel bands used to secure the shipping containers, then he and LTC Lethers removed military property from the containers and loaded the borrowed trailer. They made four trips with the trailer. During the first three trips, they transported some of the military property to LTC Lethers's home. On the fourth and final trip, they transported military property to appellant's home. Appellant then returned the trailer to SFC DW and placed new locks on the shipping containers.

That same month, June 2009, the Criminal Investigation Command (CID) in Iraq received a "tip" that the BOCAT was improperly requisitioning tools. This triggered a CID investigation which determined that the estimated dollar value of the property improperly requisitioned by the BOCAT—using the BOCAT's unique DODAAC—was approximately $385,000.00. A search of the SSAs at both Camp Liberty and FOB Prosperity revealed BOCAT requisitioned tools that had not yet been picked up. The property was identified as BOCAT ordered property because it was marked with the BOCAT's unique DODAAC. A search of FOB Prosperity discovered additional BOCAT requisitioned power tools, still in their original packaging, in another shipping container.

In August 2009, CID executed a search of appellant's off-post residence where approximately $67,000.00 worth of military property was recovered from appellant's garage.[4] During the search, appellant admitted the recovered property was from Iraq.

---

**3.** A DODAAC is a unique identifier used by military units to purchase property through a Supply Support Activity.

**4.** Among the property recovered were: two tables saws; two compound miter saws; two Makita drills; two jigsaws; two twelve-ton hydraulic jacks; over twenty varied Pelican cases; assorted tools; thirty-nine M–84 charging handles; seven global positioning satellite (GPS) units; twenty-seven ballistic sunglasses; twenty-five infrared transmitters; over twenty-five flashlights; and fifteen or more Gerber, multipurpose tools. Also found within appellant's garage was a "tuff box" that appellant mailed from Iraq to his spouse, a box he insured for $1,600.00, complete with a shipping label that indicated the box contained twenty flashlights, ten GPS units, and ten knives.

## II. LAW AND DISCUSSION

This case is now before us for review pursuant to Article 66, UCMJ. Appellant alleges two assignments of error: (1) that the evidence is legally and factually insufficient to support appellant's convictions for both larceny and attempted larceny; and (2) that appellant's sentence to confinement and a bad-conduct discharge is inappropriate and disproportionately severe.[5] We agree with appellant's first assignment of error as it relates to the attempted larceny but disagree as it relates to the larceny. Furthermore, we disagree with appellant's second assignment of error in its entirety.

### A. LEGAL AND FACTUAL SUFFICIENCY

#### 1. Standard of Review

Article 66(c), UCMJ, provides that a Court of Criminal Appeals "may affirm only such findings of guilty . . . as it finds correct in law and fact." In performing our duty, we must conduct a de novo review of legal and factual sufficiency. *United States v. Gilchrist*, 61 M.J. 785, 793 (Army Ct.Crim.App. 2005) (citing *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F.2002)). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Lubasky*, 68 M.J. 260, 263 (C.A.A.F.2010) (citations omitted). The test for factual sufficiency is "whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *United States v. Gilchrist*, 61 M.J. 785, 793 (Army Ct.Crim.App. 2005) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A.1987)). This review for factual sufficiency "involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington*, 57 M.J. at 399. As this court previously noted, "to sustain appellant's conviction, we must find that the government has proven all essential elements and, taken together as a whole, the parcels of proof credibly and coherently demonstrate that appellant is guilty beyond a reasonable doubt." *Gilchrist*, 61 M.J. at 793 (citing *United States v. Roukis*, 60 M.J. 925, 930 (Army Ct.Crim.App.2005)).

#### 2. The Larceny Charge

■ Contrary to appellant's assignment of error, this court finds the evidence both legally and factually sufficient to affirm appellant's conviction for larceny. This conclusion is not only supported by the evidence presented in the government's case, but also by the testimony given by appellant in his defense, where he stated that he did not intend to steal military property. On this point, appellant's testimony was not credible and, as such, is affirmative evidence of his guilt.

When an accused testifies on his own behalf, he does so at his own peril, risking that he might fill in gaps or provide affirmative evidence contributing to or resulting in his conviction. As the Supreme Court early established, a trier of fact necessarily assesses the veracity of an accused's testimony and considers it when resolving questions of guilt or innocence:

> Nor can there be any question that, if the jury were satisfied, from the evidence, that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made, as in themselves tending to show guilt. The destruction, suppression, or fabrication of evidence undoubtedly gives rise to a presumption of guilt, to be dealt with by the jury.

---

5. Appellant also alleges, pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), that he was the subject of "dilatory post-trial processing in violation of *United States v. Moreno*, 63 M.J. 129 (C.A.A.F.2006)." This allegation is meritless and does not warrant discussion.

*Wilson v. United States,* 162 U.S. 613, 620–21, 16 S.Ct. 895, 40 L.Ed. 1090 (1896). *See, e.g., Wright v. West,* 505 U.S. 277, 296, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (plurality opinion); *United States v. Urban,* 404 F.3d 754, 782 (3rd Cir.2005); *United States v. Jocic,* 207 F.3d 889, 893 (7th Cir.2000); *United States v. Burgos,* 94 F.3d 849, 868 (4th Cir.1996); *United States v. Friedman,* 998 F.2d 53, 57 (2d Cir.1993); *United States v. Kenny,* 645 F.2d 1323, 1346 (9th Cir.1981).

The idea that a defendant, or accused in the military context, testifies at his own peril is best summed up by the United States Court of Appeals for the Eleventh Circuit in *United States v. Williams,* 390 F.3d 1319 (11th Cir.2004):

> "Defendants in criminal trials are not obliged to testify. And a defendant who chooses to present a defense runs a substantial risk of bolstering the Government's case." *United States v. Bennett,* 848 F.2d 1134, 1139 (11th Cir.1988). "Most important, a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt." *United States v. Brown,* 53 F.3d 312, 314 (11th Cir.1995). "By 'substantive' we mean evidence adduced for the purpose of proving a fact in issue as opposed to evidence given for the purpose of discrediting a witness (i.e., showing that he is unworthy of belief), or of corroborating his testimony." *Id.* This Circuit said that "when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true." *Id.* (citations omitted).

*Id.* at 1325. "Where some corroborative evidence of guilt exists for the charged offense . . . and the defendant takes the stand in her own defense, the Defendant's testimony, denying guilt, may establish, by itself, elements of the offense." *Id.* at 1326 (citation omitted). Of special note to appellant's situation, the *Williams* court concluded that "[t]his rule applies with special force where the elements to be proved for a conviction include highly subjective elements: for example, the defendant's intent or knowledge."

*Id.* at 1326 (internal quotation marks and citation omitted).

In the case at bar, the government's case-in-chief focused on appellant's theft of military property through the misuse of his authority. As the BOCAT's primary supply sergeant, appellant regularly ordered and picked up supplies for the BOCAT. The BOCAT's mission did not entail construction—a fact which CPT BJ discussed personally with appellant—nevertheless, appellant regularly picked up BOCAT-ordered supplies that included large power tools. Towards the end of his deployment, appellant shipped the wrongfully ordered equipment back to the United States and surreptitiously transported it to his home. A search of appellant's home uncovered some of the property that was wrongfully ordered for the BOCAT.

In his defense, appellant took the stand. Appellant testified for sixty-two pages of trial transcript, explaining or attempting to explain his actions. He testified that, notwithstanding his near fifteen years of military service, he was inexperienced in the area of supply and was simply ordering specific equipment as directed by LTC Lethers, the Deputy BOCAT Chief. Appellant testified that initially he thought the construction equipment was being used to construct stadium seating for the BOC, but when the 4th Infantry Division engineers assumed that mission, appellant accepted LTC Lethers's explanation that the ordered property would be used for the 18th Fires Brigade back at Fort Bragg. Appellant testified that he accepted this explanation because LTC Lethers had deployed multiple times and said that all deployed units "plus up" on equipment from downrange.

Appellant further testified that he stored the military property in his garage in North Carolina because he and LTC Lethers were concerned that the motor pool was not secure. This concern, appellant testified, was based on a rumor that a radio had been stolen from the motor pool. Appellant testified that he agreed, as a favor to LTC Lethers, to store some of the property at his residence. When a panel member asked appellant whether there was a stateside headquarters supply sergeant, an inquiry relevant

to appellant's stated purpose of removing military property from a motor pool to his home in order to safeguard the property, appellant answered: "Yes. There was. There was a female. She had her issues as well, First Sergeant, as far as—I just didn't—she didn't strike me as competent in her abilities but that had nothing to do with my decision whatsoever." When asked about coordination with the detachment commander, who was still forward deployed, about the distribution plan for the property appellant took to his home, appellant responded:

> I did not speak to Captain [BJ] again until his return. I thought that I had—since I had spoke to Captain [BJ's] boss, [LTC Lethers,] and had gotten an answer on where—where—what the distro plan was, that I had spoke to the appropriate person, that Captain [BJ], being as how he was aware that—he was present during all these meetings and he was aware that these items were being ordered, I was assuming because everyone knew that needed to know that it would just get taken care of once they returned home.[6]

When asked by his trial defense counsel about his intent regarding the property found in his garage, appellant testified: "My intent was to take them back to the 18th Fires Brigade as per Colonel Lethers' [s] instructions upon their redeployment. That was my only intention."

 As the Supreme Court has noted and Circuit Courts of Appeals have reinforced, the panel in appellant's case was free to disbelieve appellant's testimony and free to consider that testimony as substantive evidence of guilt. "A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved,

but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn." *United States v. Cisneros*, 448 F.2d 298, 305–06 (9th Cir.1971) (citing *Dyer v. MacDougall*, 201 F.2d 265, 268 (2d Cir.1952)).

Having reviewed the government's evidence ourselves afresh, as well as appellant's direct testimony, we are satisfied of appellant's guilt as to the larceny of military property beyond a reasonable doubt. We find appellant's testimony incredible, rejecting his self-serving account of why he used his position as supply sergeant in Iraq to order thousands of dollars of non-mission essential property and thereafter remove that property from the motor pool to his home. Appellant's conviction on the charged offense is both legally and factually sufficient.

### 3. The Attempted Larceny Charge

 Unlike the larceny charge, the attempted larceny charge is not supported by sufficient evidence to convince us beyond a reasonable doubt of appellant's guilt. The attempted larceny charge alleges that appellant attempted to steal the military property that was discovered on FOB Prosperity in Iraq following appellant's redeployment; however, the government's evidence did not sufficiently tie appellant to this property and appellant did not testify regarding this property.

A review of the evidence introduced by the government on the attempted larceny reveals nothing more than photographs of non-mission essential property found in Iraq that was linked to the BOCAT's unique DOD-AAC,[7] combined with testimony from other BOCAT personnel that they did not order that property. For reasons unknown to this court, the government chose not to introduce

---

6. Captain BJ's direct testimony contradicts, in its entirety, appellant's testimony. Captain BJ testified he advised appellant to order office supplies and equipment necessary for those personnel going outside the wire. Captain BJ's testimony establishes a lack of awareness on his part of the orders placed by appellant for power tools and non-mission essential equipment. Unaware of the orders for the property at issue in appellant's case, Captain BJ neither testified to nor had any knowledge of any redistribution plan to "plus up" any units of the 18th Fires Brigade.

7. For example, the government offered as prosecution exhibits pictures of power tools found by CID agents in June of 2009 at the SSA at FOB Prosperity, tools requisitioned by the BOCAT but not yet picked up. The military judge, over defense's objection that "there is no linkage whatsoever that these items had anything to do with Sergeant Pleasant," admitted these exhibits.

the actual order forms bearing the signature of the individual who ordered the property (i.e., the DA Form 2765s) or the date the property was ordered. In addition to appellant, there was at least one additional NCO with the apparent authority to order equipment whose actions during the relevant time-period went unaddressed.

The government failed to establish who ordered this property or when the property was ordered. Appellant's testimony failed to address either question. Other than generic testimony about placing orders for property while in Iraq, appellant's sixty-two pages of testimony, both on direct examination and during cross-examination, is silent with regards to the property found in Iraq after his departure. Despite having appellant on the stand and subject to cross-examination, the government did not pursue any questions about the property found after appellant's departure from theater. Thus, appellant's testimony does not provide substantive evidence of his guilt with regards to the attempted larceny. Accordingly, we find the evidence factually insufficient to establish appellant's guilt of attempted larceny beyond a reasonable doubt.

### B. SENTENCE REVIEW

Appellant's second assignment of error alleges that his sentence to confinement for eleven months and a bad-conduct discharge is both inappropriate and disproportionately severe. This allegation warrants discussion but no relief. In reaching our conclusion, this court not only considered appellant's character, the nature and seriousness of the crimes at issue, and appellant's record of trial, but we also took judicial notice of the record of trial in the general court-martial of appellant's co-accused, LTC Lethers. *See United States v. Smith,* 56 M.J. 653, 659 n. 7 (Army Ct.Crim.App.2001) (collecting cases establishing an appellate court's authority to judicially notice other records or portions thereof in exercising its Article 66, UCMJ

authority). We first address the disparity in sentences between appellant's case and his co-accused, LTC Lethers, after which we address sentence reassessment and appropriateness in light of this court's finding that appellant's conviction for attempted larceny is factually insufficient.

#### 1. Sentence Disparity

■ Sentence comparison, unlike sentence appropriateness, is required only in "those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases." *United States v. Lacy,* 50 M.J. 286, 288 (C.A.A.F.1999) (quoting *United States v. Ballard,* 20 M.J. 282, 283 (C.M.A.1985)). The burden is on the appellant seeking relief to show that his or her case is "closely related" to the cited cases and that the sentences are "highly disparate." *Id.* Once met, the burden shifts to the government to show a rational basis for the disparity. *Id.*

■ The government concedes that appellant's case is "closely related" to that of LTC Lethers, and we agree. Having decided the cases are "closely related," we next look to any disparity in the adjudged sentences to determine if they are, in fact, "highly disparate." *United States v. Roach,* 69 M.J. 17, 21 (C.A.A.F.2010); *United States v. Sothen,* 54 M.J. 294, 296 (C.A.A.F.2001) (quoting *Ballard,* 20 M.J. at 283).

After a fully contested trial, the panel sentenced appellant to a bad-conduct discharge, confinement for twenty-four months, forfeiture of all pay and allowances, and reduction to the grade of E–1. The convening authority approved only so much of the sentence as provided for a bad-conduct discharge, confinement for eleven months, and reduction to the grade of E–1.[8] Appellant's co-accused, LTC Lethers, was tried and convicted by a military judge alone of larceny of military property in Iraq and was sentenced to eleven months' confinement, a sentence approved by

---

8. The post-trial documentation in appellant's case is silent as to why the convening authority reduced appellant's period of confinement from twenty-four months to eleven months. One possible conclusion is that the reduction in confinement was to bring appellant's period of confinement in line with that of LTC Lethers. However, absent a clear rationale from the convening authority for appellant's thirteen-month reduction in confinement, this court will not speculate as to the impetus for this reduction.

the same convening authority who acted on appellant's case.[9]

While disparate, we find appellant has not met his burden in showing that the adjudged sentences are "highly disparate." *See, e.g., Lacy,* 50 M.J. at 289 (appellant's eighteen-month sentence for indecent acts and carnal knowledge not "highly disparate" when compared to two co-accused's respective sentences of eight and fifteen months). *See also, United States v. Fee,* 50 M.J. 290 (C.A.A.F.1999) (affirming lower court's opinion finding sentence of one co-accused to dishonorable discharge and six years not highly disparate when compared to other co-accused's sentence to a bad-conduct discharge and confinement for fifteen months).

At the time of sentencing, appellant faced a maximum punishment of reduction to the grade of E–1, forfeiture of all pay and allowances, confinement for twenty years (two-hundred and forty months), and a dishonorable discharge. In addition to reduction to the grade of E–1 and forfeiture of all pay and allowances, the panel sentenced appellant to 10% of the maximum period of confinement (i.e., twenty-four months) and the lesser of the two punitive discharges available, a bad-conduct discharge. Lieutenant Colonel Lethers faced a maximum punishment of forfeiture of all pay and allowances, confinement for ten years (one-hundred and twenty months), and dismissal from the service. He was sentenced to 9% of the maximum period of confinement possible (i.e., eleven months). Unlike appellant, the only possible punitive discharge for LTC Lethers was a dismissal, viewed generally as the "equivalent of a dishonorable discharge." Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook [hereinafter Benchbook], para. 2–5–22 (1 Jan. 2010). Our conclusion regarding the disparate nature of the sentences is unchanged notwithstanding this court's decision that appellant's conviction for attempted larceny is factually insufficient, thereby reducing appellant's maximum period of possible confinement from twenty years to ten years.

Assuming arguendo appellant has met his burden in showing that his adjudged sentence is "highly disparate" when compared to that of his co-accused, we find that a rational basis exists for such disparity. *Sothen,* 54 M.J. at 296; *Lacy,* 50 M.J. at 288. The prior disciplinary histories of appellant and his co-accused stand in stark contrast. Until the time of trial, LTC Lethers's military career was unblemished. Appellant, on the other hand, as evident by the government's case in aggravation, had two General Officer Memoranda of Reprimand in his official files. Appellant's first reprimand was issued in July 2000, for operating a vehicle with a blood alcohol concentration of .12%. Appellant's second reprimand was issued in September 2006, this time for wrongful use of a controlled substance, ketamine, while serving as a Special Forces medic in Afghanistan. Appellant's NCO evaluation report for the period covered by his second reprimand reflects that he possessed "limited" potential, that his "irresponsible handling of controlled substances caused himself and others to be incompacitated (sic) and incapable of conducting operations at a moments (sic) notice," and documents appellant's "[failure] to complete a combat tour due to lack of personal discipline." Appellant's wrongful use of a controlled substance also led to the revocation of his Special Forces tab.

In addition to notably different military careers vis-à-vis prior misconduct or the lack thereof, appellant and LTC Lethers also have significantly different deployment histories. Appellant deployed twice for a total of eighteen months, both deployments marred by criminal activity. Appellant's first deployment ended after six months because of his wrongful use of a controlled substance. Appellant's second deployment covers the period of the charges for which he stands convicted. LTC Lethers has four deployments for a total of forty months: Qatar for nine months; and Iraq for four, twelve, and fifteen months. Appellant and his co-accused also differ significantly when considering retirement eligibility. At the time of sentenc-

---

**9.** Action was taken in LTC Lethers's case on 21 April 2011 and in appellant's case fifteen days thereafter, on 6 May 2011.

ing, appellant had less than fifteen years of active duty service towards retirement whereas LTC Lethers was retirement eligible with over twenty years of active duty service. Regarding the larcenies themselves, an estimated $67,000 in property was recovered from appellant's home whereas the estimated value of the property recovered from LTC Lethers's residence was $12,000.[10]

Finally, appellant testified on the merits in his court-martial whereas LTC Lethers did not. Appellant's testimony offers an additional basis upon which to rationally distinguish the respective punishments. Addressing an accused's mendacity as it relates to sentencing, our superior court noted:

> [A]n accused's mendacity may be considered by a sentencing authority in arriving at a just sentence. *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) (sentencing judge could properly consider a defendant's false testimony, as observed by the judge at trial, when considering an accused's rehabilitative potential and fixing sentence.) However, consideration of an accused's false testimony is limited to the determination of rehabilitative potential. *United States v. Warren*, 13 M.J. [278] at 285 [ (1982) ], citing *Grayson*.

*United States v. Edwards*, 35 M.J. 351, 355 (C.M.A.1992). In appellant's case, the military judge properly instructed the panel, both orally and in writing, as follows:

> Mendacity: The evidence presented and the argument of trial counsel raised the question of whether the accused testified falsely before this court under oath. No person, including the accused, has a right to seek to alter or affect the outcome of a court-martial by false testimony. You are instructed that you may consider this issue only within certain constraints.
>
> First, this factor should play no role whatsoever in your determination of an appropriate sentence unless you conclude that the accused did lie under oath to the court. Second, such lies must have been, in your view, willful and material—meaning impor-

tant—before they can be considered in your deliberations.

> Finally, you may consider this factor insofar as you conclude that it, along with all the other circumstances in the case, bears upon the likelihood that the accused can be rehabilitated. You may not mete out additional punishment for the false testimony itself.

The instruction given is consistent with *Edwards* and identical to the mendacity instruction in the Military Judges' Benchbook in all respects except one, the military judge's omission of the word "sentencing" before the word "argument." *See* Benchbook, para. 2–5–23.

A side-by-side comparison of appellant and his co-accused reveals soldiers with significantly different disciplinary and deployment histories. Additionally, appellant testified on the merits at his trial whereas his co-accused did not, risking that if disbelieved the panel might take into account appellant's mendacity in sentencing insofar as his mendacity relates to his rehabilitative potential. Accordingly, there can be no doubt that a rational basis exists for the disparate sentences between appellant and his co-accused, LTC Lethers.

### 2. Sentence Reassessment and Sentence Appropriateness

In light of our decision to set aside the findings of guilt to the attempted larceny charge and its specification, we must consider whether reassessment without a rehearing is possible, and if so, whether the sentence must be reduced. *United States v. Sales*, 22 M.J. 305, 308 (C.M.A.1986); *United States v. Moffeit*, 63 M.J. 40, 43 (C.A.A.F.2006) (Baker, J., concurring). In this case, we can be "reasonably certain as to the severity of the sentence that would have resulted in the absence of the error," *Sales*, 22 M.J. at 307 n. 3, and therefore, we will reassess the sentence at our level.

▮ In performing our reassessment, we conclude that the prejudicial error does not warrant reduction of appellant's sentence.

---

**10.** A review of LTC Lethers's record of trial reveals the government established LTC Lethers stole approximately $9,000 in military property. In appellant's case, however, the government established the recovery of an estimated $12,000 in property from LTC Lethers's residence.

Although dismissal of the attempted larceny charge reduces the maximum possible punishment in appellant's case by half, appellant remains convicted of the most aggravating offense. The gravamen of appellant's misconduct was the manipulation and misuse of the Army supply system to steal military property. The government's case focused mainly on the actions taken by appellant while deployed to abuse his position of trust to order non-mission essential equipment which was shipped back from Iraq to the United States and ultimately ended up in his home and the home of his co-accused. The attempted larceny of the BOCAT-ordered property found in Iraq after appellant's departure had little impact on the case as a whole. Accordingly, we are confident that appellant's sentence would have been no less severe than that approved by the convening authority: a bad-conduct discharge, eleven months' confinement, and reduction to the grade of E-1.

Having found that appellant would have received a sentence equal to or greater than that approved by the convening authority, we next turn to the appropriateness of appellant's sentence. *Sales,* 22 M.J. at 307–08. Sentence appropriateness is reviewed de novo. *United States v. Bauerbach,* 55 M.J. 501, 504 (Army Ct.Crim.App.2001) (citing *United States v. Cole,* 31 M.J. 270, 272 (C.M.A.1990)). In determining sentence appropriateness, an exercise of a service court's Article 66, UCMJ, authority, the court looks to the character of the offender, the nature and seriousness of the offenses, and the entire record of trial. *United States v. Snelling,* 14 M.J. 267, 268 (C.M.A.1982); *United States v. Ransom,* 56 M.J. 861, 865 (Army Ct.Crim.App.2002); *United States v. Triplett,* 56 M.J. 875, 885 (Army Ct.Crim.App.2002).

In this case, we find the sentence appropriate. Since appellant became a NCO in December of 1999, he engaged in criminal activity on three occasions, culminating in his present conviction. In 2000, appellant operated a vehicle while intoxicated, resulting in his first general officer memorandum of reprimand. In his response to this reprimand, appellant stated: "I know what I have done is wrong and I will do everything in my power to get this behind me and drive on being the best Non Commissioned Officer that I can be." Less than six years later, in 2006, appellant wrongfully used a controlled substance while serving as a Special Forces medic. This resulted in appellant's second general officer memorandum of reprimand as well as his early departure from a combat zone. In appellant's rebuttal to his second reprimand, appellant wrote, in part: "I recognize that my decision placed the public, my unit, and myself in danger. I regret this incident tremendously and will do whatever is necessary to rectify it. . . . I ask your forgiveness and for you to please give me another chance Sir." Three years later, appellant again abused his position of trust while deployed, this time stealing military property of a value more than $500.00, approximately $67,000.00 of which was recovered from his North Carolina home. Therefore, in consideration of appellant's character, the nature and seriousness of the offense for which appellant stands convicted, and the entire record of trial, we find appellant's sentence, as approved by the convening authority, appropriate.

## III. CONCLUSION

On the basis of the entire record, appellant's assignments of error, the government's responses thereto, the matters submitted pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A.1982), and the oral argument before this court, the findings of guilty of Charge I and its Specification are set aside and dismissed. The remaining findings of guilty are AFFIRMED. Reassessing the sentence on the basis of the error noted, the entire record, and in accordance with the principles articulated in *Sales* and *Moffeit,* to include those factors noted in Judge Baker's concurring opinion, the sentence is AFFIRMED.

Senior Judge KERN and Senior Judge YOB concur.