# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
LIND, KRAUSS, and PENLAND
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist HENRY L. WILLIAMS III**
**United States Army, Appellant**

ARMY 20130284

Headquarters, XVIII Airborne Corps and Fort Bragg
Tara A. Osborn, Military Judge (arraignment)
David H. Robertson, Military Judge (trial)
Colonel Paul S. Wilson, Staff Judge Advocate


For Appellant: Colonel Kevin Boyle, JA; Major Vincent T. Shuler, JA; Captain Michael J. Millios, JA (on brief).

For Appellee: Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA; Major Catherine L. Brantley, JA; Captain Rachel T. Brant, JA (on brief).


28 August 2014

---------------------------------
MEMORANDUM OPINION
---------------------------------


*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

PENLAND, Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of failure to go to his appointed place of duty, disobedience of a superior commissioned officer, disobedience of a noncommissioned officer (two specifications), false official statement, wrongful use of marijuana, larceny (three specifications), housebreaking (two specifications), and bigamy in violation of Articles 86, 90, 91, 107, 112a, 121, 130, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 886, 890, 891, 907, 912a, 930, 934 (2006). The military judge convicted appellant, contrary to his pleas, of two specifications of larceny in violation of Article 121, UCMJ. The military judge sentenced appellant to a bad-conduct discharge and confinement for eighteen months. In accordance with a pretrial agreement, the convening authority approved only so much of the sentence as provided for a bad-conduct discharge and fifteen months of confinement.

The convening authority also credited appellant with 123 days against the sentence to confinement.

Appellant raises one assignment of error arguing that the evidence to support his contested larceny convictions is legally insufficient because the government "improperly alleged that the victims were the individual account holders." We disagree and hold the evidence is both factually and legally sufficient to support his convictions of larceny. Appellant also personally raises matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), including an allegation that the military judge erred by asking a sentencing witness about the "slow pace of justice" in appellant's case and its effect on good order and discipline. We hold that the military judge's improper line of questioning rises to the level of plain error, however, we are confident we can reassess the sentence to cure any prejudice. Appellant's remaining assertions pursuant to *Grostefon* are without merit.

## FACTUAL AND LEGAL SUFFICIENCY
## OF SPECIFICATIONS 1 AND 2 of CHARGE VI

### *Facts and Procedural Background*

On numerous occasions and without authority to do so, appellant wrongfully used other soldiers' debit card information in order to obtain goods and services for himself and others.

Appellant was charged with, *inter alia*, multiple specifications of larceny. Specifications 1 and 2 of Charge VI, to which he pleaded not guilty, alleged respectively:

> In that [appellant], did, at or near Fort Bragg, North Carolina, on divers occasions, between on or about 26 December 2011 and on or about 4 February 2012, steal money, of a value of more than $500, the property of Private First Class [(PFC) BI].

> In that [appellant], did, at or near Contingency Operating Site Warrior, Iraq, on divers occasions, between on or about 30 June 2011 and on or about 7 July 2011, steal money, of a value of more than $500, the property of Specialist [(SPC) JA].

### *Specification 1 of Charge VI*

From December of 2011 through early February of 2012, PFC BI was appellant's barracks roommate at Fort Bragg. Private First Class BI was also

2

assigned to appellant's unit. He maintained a checking account with Boulder Valley Credit Union. In early February 2012, a fraud agency employed by the credit union contacted PFC BI to report that multiple, apparently fraudulent charges had posted to his checking account, causing it to be overdrawn. Private First Class BI reviewed his credit union statement and identified multiple unauthorized charges totaling $3067.70; this figure included two charges to Verizon Wireless for $2260. He tried to contact merchants who had submitted charges to his credit union and ultimately obtained a food purchase receipt, which bore PFC BI's debit card information and appellant's name as the customer.

Appellant testified at trial, offering on direct examination an explanation for his unauthorized use of PFC BI's debit card information. After admitting that he wrongfully obtained the information, appellant testified that he would use it to order food for his children. After asserting that the unauthorized food charges totaled less than $500, appellant turned to the unauthorized charges from Verizon Wireless.

> DC: Can you explain the Verizon bill because your name is on that account and [PFC BI's] debit card is linked to your account with your name on it; can you explain that?
>
> ACC: I never -- I never had a Verizon account. I had a TracFone. I had -- when I got the -- I got my wife a Verizon phone, but her credit is messed up so I had to put it under my name; and after I found out that she was having an affair, I pretty much, like, closed the account. I stopped paying bills, stopped making payments on it, but when I got sent to -- when I -- after we had the argument and the first sergeant put me in the barracks program and I wasn't able to go to the house -- or go back to the house and, like, tear up the card -- well the piece of paper that I wrote the card information from ----
>
> DC: Let me back up for a second. You're saying the piece of paper with the ----
>
> ACC: Uh-huh [affirmative response].
>
> DC: ---- with [PFC BI's] infor [sic] -- debit card information was at your house.
>
> ACC: Yes, sir.
>
> DC: How did it get there?

ACC: I took it there while I walked home one day.

DC: Where did you put it?

ACC: In a -- in the second drawer, on the top shelf that I keep all my, like undergarments in, like shirt -- T-shirts and boxers.

DC: In your bedroom?

ACC: Yes, sir.

DC: So, okay, go -- so you were -- I'm sorry. You were saying that you never had a Verizon account.

ACC: No.

DC: Your name was linked to your wife's phone number.

ACC: Yes.

DC: So you were paying her account.

ACC: Yes.

DC: Please explain, then, how those two payments totaling over two thousand dollars using [PFC BI's] debit card were linked to the account under your name that was your wife's phone number.

ACC: She made the -- the purchase.

The military judge convicted appellant of Specification 1 of Charge VI.

*Specification 2 of Charge VI*

In the summer of 2011, appellant was deployed to Iraq with his unit. He worked in close proximity to SPC JA, another soldier in appellant's battalion. Specialist JA maintained a BB&T bank account. He monitored his finances, in part, by reviewing his account statements through the bank's website. In early July 2011, SPC JA noticed that two unauthorized charges, totaling $755.10, had been made to the account.

4

The unauthorized charges were associated with pending purchases from ComputerGeeks.com. Without SPC JA's knowledge or authorization, appellant had used his debit card information in an attempt to obtain an Apple MacBook computer, which ComputerGeeks.com offered for $509.99. Appellant had also used the debit card information in an attempt to obtain an Apple iBook, offered for $199.99, for his then-girlfriend, OW. ComputerGeeks.com flagged the two transactions as fraudulent and never shipped either computer. ComputerGeeks.com suffered no financial loss. Because the merchant did not fulfill appellant's orders, BB&T provided no money to the merchant. However, aware of the pending transactions, BB&T did render unavailable to SPC JA the associated monetary amounts (including shipping and handling costs). As a result, SPC JA temporarily lost $755.10, permanently lost $70 in bank overdraft fees, and did not have sufficient funds to make his monthly car payment with his BB&T account.

Specialist JA informed his supervisor of the unauthorized charges and was advised to report them to law enforcement authorities. Appellant heard SPC JA's comments and subsequently approached him, claiming that he had accidentally used his debit card information to make online purchases. Appellant repeated that claim in his testimony at trial:

> DC: Can you explain what happened?
>
> ACC: My wife, she had -- well, she was my girlfriend at the time, but my wife now . . . she had gave -- I had called her over the phone before me and [SGT M] went out to do a mission. I asked her to give me my credit card information, and I wrote it down in my green Leadership Book that I keep in the first drawer behind the desk that me and [SGT M] alternate from back and forth, but she was in a hospital and she was, like, bleeding uncontrollably, so she was like -- they had her on bed rest and she couldn't, like, really do anything. She told me that she wanted -- she wanted me to purchase her a computer, so after me and [SGT M] came back from our -- from our two missions that we had to do, I went online and I tried to find, like, the two cheapest computers. I ordered me one and I ordered her one. I got it sent to the house that her brother was staying at under her name, the one I purchased for her; the one that I purchased for me, I got it sent to -- sent to where I was stationed at in Iraq.
>
> DC: Explain the process; you said you ordered it online, correct?

ACC:  Yes, sir.

DC:  When you used the card, you used numbers that were in your Leadership Book, correct?

ACC:  Yes, sir.

DC:  And those turned out to be [SPC JA's] numbers, correct?

ACC:  Yes, sir.

DC:  How did those numbers get into your book?

ACC:  The only thing I can think of is if he wrote them down hisself [sic], because I was never inside the office. Me and [SGT M], we was [sic] always out doing missions, installing phone lines.

The military judge convicted appellant of Specification 2 of Charge VI.

### *Law & Discussion*

In performing our duty under Article 66, UCMJ, we conduct a de novo review of legal and factual sufficiency. *United States v. Gilchrist*, 61 M.J. 785, 793 (Army Ct. Crim. App. 2005) (citing *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)). The test for factual sufficiency is "whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *Gilchrist*, 61 M.J. at 793 (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). The test for legal sufficiency is whether, considering the evidence "in the light most favorable to the [g]overnment, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Winckelmann*, 70 M.J. 403, 406 (C.A.A.F. 2011) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In addition to the evidence introduced by the government at trial, appellant's testimony convinces us of the factual and legal sufficiency of the larceny convictions at issue. His own words at trial eliminate any doubt that he intended to permanently deprive PFC BI and SPC JA of over $500 each. *See generally United States v. Pleasant*, 71 M.J. 709, 712 (Army Ct. Crim. App. 2012) ("When an accused testifies on his own behalf, he does so at his own peril, risking that he might fill in gaps or provide affirmative evidence contributing to or resulting in his conviction."). Faced with incredible testimony from an accused, the finder of fact may exercise:

6

> [T]he right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or procured to be made, as in themselves tending to show guilt. The destruction, suppression, or fabrication of evidence undoubtedly gives rise to a presumption of guilt, to be dealt with by the [finder of fact].

*Id.* at 712-13 (quoting *Wilson v. United States*, 162 U.S. 613, 620-21 (1896)).

Appellant posited the following with respect to Specification 1 of Charge VI: he took home the piece of paper containing PFC BI's debit card information and placed it in his underwear drawer; OW used PFC BI's information to make the larger, unauthorized charges associated with a Verizon Wireless account bearing appellant's name; and, appellant specifically remembered that OW informed him of her actions while he drank alcohol and smoked marijuana. Turning to Specification 2 of Charge VI, despite SPC JA's testifying that he never provided appellant with his debit card information, appellant offered that: SPC JA may have mistakenly written his debit card information in appellant's notebook without his knowledge; and, some time afterward, appellant mistakenly used that information to purchase computers online for OW and himself. Taken alone, any of these events is doubtful. Taken together and coupled with the government's evidence at trial, they are patently absurd and affirmatively establish his guilt.

We now turn to appellant's argument that PFC BI and SPC JA were not "correct victims" of the contested larceny specifications. Article 121, UCMJ, prohibits larceny in the following manner:

> (a) Any person subject to this chapter who wrongfully takes, obtains, or withholds, by any means, from the possession of the owner or of any other person any money, personal property, or article of value of any kind—
>
> (1) with intent permanently to deprive or defraud another person of the use and benefit of property or to appropriate it to his own use or the use of any person other than the owner, steals that property and is guilty of larceny[.]

*Manual for Courts-Martial, United States* (2008 ed.) [hereinafter *MCM*], pt. IV, ¶ 46.a(a)(1).

Electronic commerce and the related increased possibility of larceny by identity-theft have perhaps prompted the following 2002 amendment to the *Manual for Courts-Martial*: "Wrongfully engaging in a credit, debit, or electronic transaction to obtain goods or money is an obtaining-type larceny by false pretense. Such use to obtain goods is usually a larceny of those goods from the merchant offering them." *MCM*, pt. IV, ¶ 46.c(1)(h)(vi). The Drafter's Analysis includes the proviso that "[a]lternative charging theories are also available . . . . The key under Article 121 is that the accused wrongfully obtained goods or money from a person or entity with a superior possessory interest." *MCM*, UCMJ art. 121 analysis at A23-15–A23-16 (internal citations omitted).

Our superior court has clearly affirmed both of these principles. *See United States v. Cimball Sharpton*, 73 M.J. 299 (C.A.A.F. 2014); *United States v. Lubasky*, 68 M.J. 260 (C.A.A.F. 2010). In *Cimball Sharpton*, CAAF considered a larceny by credit card and held that an alternative charging theory—naming a victim other than the merchant or bank—was viable. 73 M.J. at 301-02. In *Lubasky*, CAAF stated: "Under Article 121, UCMJ, larceny always requires that the accused wrongfully obtain money or goods of a certain value from a person or entity *with a superior possessory interest*." 68 M.J. at 263 (emphasis added). The CAAF also recently reaffirmed that the "victim of the larceny is the person or entity suffering the financial loss or deprived of the use or benefit of the property at issue." *Cimball Sharpton*, 73 M.J. at 299 (citing *Lubasky*, 68 M.J. at 263-64).

Appellant now argues that in Specifications 1 and 2 of Charge VI, "the unauthorized use of the debit card information was a common 'obtaining-type larceny by false pretense' where the property owner would be either the bank or merchants *depending upon who suffered the loss*." (Emphasis added). We partially agree to the extent that appellant draws our focus to the person or entity who suffers the loss in a larceny. We disagree with appellant that the banks or merchants were the only potential victims of appellant's misconduct. Indeed, PFC BI and SPC JA were actual victims in this case. Appellant caused the movement of their money from their control, intending to permanently deprive them and actually depriving them of its use and benefit. Like in *Cimball Sharpton*, we hold that under the facts of this case, alternative charging theories were available and PFC BI and SPC JA were properly described as victims in the contested larceny specifications.

## IMPROPER SENTENCING EVIDENCE

### *Procedural Background*

During sentencing, trial counsel attempted to establish that appellant's misconduct adversely affected good order and discipline in his unit. Captain (CPT) JF, appellant's company commander, testified and after a series of objections regarding the proper scope of his testimony, the military judge correctly instructed

assistant trial counsel to "limit [his] questions to the direct impact of the accused's misconduct on the unit" or a victim. The following exchange occurred immediately after the military judge's specific guidance:

> ATC: [CPT JF], what type of impact, if any, did [appellant's] misconduct have on the efficiency, discipline, and mission of your unit?
>
> CPT JF: Well, it was -- I mean, it was a huge impact on the morale and welfare of our soldiers, you know, as hearsay and rumors amongst soldiers was spread about different charges that [appellant] faced. You know, soldiers were upset, mad; their morale was pissed off as they, you know, received company grades or counselings for minor infractions ----
>
> ADC: Objection, Your Honor.
>
> MJ: Basis?
>
> ADC: Improper aggravation evidence; there's -- he's getting into discussions about what was chosen and not chosen to do as per administrative actions or other burdens, whether it was to this individual soldier or soldiers that are not even present or charged in this court-martial.
>
> MJ: Government?
>
> ATC: Your Honor, [CPT JF], if allowed to continue, will testify how the other soldiers perceived what was going on with [appellant] and how that adversely impacted the unit; how his misconduct and what was going forward with that impacted his ability to maintain good order and discipline in his unit.
>
> MJ: Government, I'll allow you some latitude in this area. Objection's overruled.
>
> CPT JF: Okay. Well besides the soldiers being upset that he wasn't receiving a punishment and they had, there was even threatening against him, especially when the barracks incidents happened; that they wanted to take into his [sic] own hands because they felt justice wasn't being served to

him fast enough. When it came to -- our unit was extremely busy with a lot of missions at the time. When it came -- I had to bring NCOs out to escort him around to make ----

ADC: Objection, Your Honor.

MJ: Basis?

ADC: Improper aggravation evidence; he's going into the administrative burden.

MJ: Government?

ATC: Your Honor, this goes to the efficiency of the command, which is one of the proper parts of the unit that can be affected by the accused's misconduct.

MJ: Objection sustained.

Before allowing the defense counsel to cross-examine CPT JF, the military judge had the following exchange with the witness:

MJ: [CPT JF], you talked about the impact on the unit about the other soldiers observing what they felt was the slow pace of justice and wanting to take matters into their own hands. What do you base that observation on?

CPT JF: Yes, sir. I mean, rumors and hearsay had gotten to me that they were threatening beating him down.

MJ: And how was that transmitted to you?

CPT JF: Through NCO channels, like, "Hey, sir. These soldiers want to beat him up."

Trial defense counsel did not object to the military judge's questions, and the military judge did not explain his purpose for asking them. Captain JF was the only witness who testified about impact on the unit.

### *Law & Discussion*

With no objection to either the military judge's improper questioning or the witness's answer, we apply a plain error analysis. *See United States v. Eslinger*,

70 M.J. 193, 197-98 (C.A.A.F. 2011). Appellant bears the burden of demonstrating that: "(1) there was error; (2) the error was plain, clear, or obvious, and (3) the error materially prejudiced one of his substantial rights." *United States v. Fisher*, 67 M.J. 617, 620 (Army Ct. Crim. App. 2009); *see also United States v Powell*, 49 M.J. 460, 463-65 (C.A.A.F. 1998).

The military judge's question and the witness's answer went beyond well-established limits on evidence in aggravation. *See* Rule for Courts-Martial 1001(b)(4). Such evidence about soldiers' desire "to take matters into their hands" because of "the slow pace of justice" as negatively impacting good order and discipline in a unit is exactly the kind of administrative burden which courts-martial are prohibited from considering during sentencing. *See Fisher*, 67 M.J. 617. Thus, we find plain and obvious error.

With regard to prejudice, "[w]e test the erroneous admission . . . of evidence during the sentencing portion of a court-martial to determine if the error substantially influenced the adjudged sentence." *Eslinger*, 70 M.J at 200-01 (quoting *United States v. Griggs*, 61 M.J 402, 410 (C.A.A.F. 2005)). "Military judges are presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Rodriguez*, 60 M.J. 87, 90 (C.A.A.F. 2004). The fact that the military judge *elicited* the improper testimony about soldiers' desire "to take matters into their hands" because of "the slow pace of justice" provides some evidence to demonstrate the judge *considered* the improper evidence in reaching appellant's sentence.[*] Furthermore, the judge sentenced appellant to precisely the sentence the assistant trial counsel requested in the government's sentencing argument. Under the unique circumstances of this case, we conclude the improper evidence substantially influenced the adjudged sentence. Nonetheless, we are confident we can cure any prejudice through sentence reassessment.

## CONCLUSION

The findings of guilty are AFFIRMED. Reassessing the sentence on the basis of the error noted, the entire record, and applying the principles of *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986) and *United States v. Winckelmann*, 73 M.J. 11 (C.A.A.F. 2013), we are confident appellant would have received a sentence at

---

[*] A military judge is presumed to know the law, apply it correctly, and filter out inadmissible evidence when fashioning a sentence. *Fisher*, 67 M.J. at 622. Once again, we stress that while there is no requirement for a military judge to note that he or she did not consider improper evidence or arguments, "a transparent statement by the military judge that he is not considering improper evidence or argument forcefully moots any potential issues and . . . further increases the perception of fairness in the military justice system." *Id.* at 623 n.5.

WILLIAMS — ARMY 20130284

least as severe as the approved sentence of a bad-conduct discharge and fifteen months confinement. The approved sentence is AFFIRMED.

Judge KRAUSS concurs.

LIND, Senior Judge, concurring in part and dissenting in part:

I concur with the majority opinion that we should affirm the findings of guilty and the sentence. However, with regard to the alleged improper sentencing evidence the military judge elicited, I disagree that there was plain error.

I do not find the military judge's question about the "slow pace of justice" constitutes error that was plain or obvious. The military judge referenced the "slow pace of justice" in only one question. There is no explicit evidence in the record that the judge elicited this fact as aggravation evidence. An equally plausible explanation for eliciting this fact is to consider it as mitigation evidence in favor of appellant due to the delay by the government in bringing the case to trial and the negative impact on appellant of dealing with soldiers who wanted to "beat him up" for something outside of his control.

I also find no prejudice in this case. Assistant trial counsel made no reference to any of the allegedly impermissible testimony during his sentencing argument. Appellant was convicted of numerous offenses, including theft from fellow soldiers, use of drugs, housebreaking, false official statement, disobeying commissioned and noncommissioned officers, failure to repair, and bigamy. He was facing a significant maximum punishment and received only a fraction of the potential maximum sentence. Appellant also cannot show material prejudice "when he received the protection and benefit of a pretrial agreement that limited his maximum time in confinement to [fifteen months] regardless of the sentence adjudged by the court." *United States v. Fisher*, 67 M.J. 617, 623 (Army Ct. Crim. App. 2009) (quoting *United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006) (citations omitted)). Ultimately, I do not find that the military judge's single question *substantially* influenced appellant's adjudged sentence. *See United States v. Eslinger*, 70 M.J. 193 (C.A.A.F. 2011). For these reasons, I respectfully dissent from my colleagues' holding of plain error.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

12