# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant RAYMOND P. PASAY**
**United States Army, Appellant**

ARMY 20140930

Headquarters, 1st Cavalry Division
Rebecca K. Connally, Military Judge (arraignment)
Wade N. Faulkner, Military Judge (trial)
Lieutenant Colonel James D. Levine, II, Acting Staff Judge Advocate (pretrial)
Colonel Alison C. Martin, Staff Judge Advocate (recommendation)
Lieutenant Colonel Michael D. Jones, Acting Staff Judge Advocate (addendum)

For Appellant:  Lieutenant Colonel Melissa R. Covolesky, JA; Major Christopher D. Coleman, JA; Captain Joshua G. Grubaugh, JA (on brief); Major Christopher D. Coleman, JA; Captain Joshua G. Grubaugh, JA (on reply brief).

For Appellee:  Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Melissa Dasgupta Smith, JA; Captain Christopher A. Clausen, JA (on brief).

19 April 2017

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Judge:

Appellant, Sergeant (SGT) Raymond Pasay, appeals his conviction for the rape and sexual abuse of his daughter, AM.[1]  Of appellant's five assignments of

---

[1] Appellant was convicted of two specifications of abusive sexual contact with a child, two specifications of aggravated sexual abuse of a child, two specifications of aggravated sexual assault of a child, indecent act, rape, and production of child pornography in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 920, 934 (2006 & Supp. IV; 2012) [hereinafter UCMJ].

error, three merit detailed discussion. Although we find one specification to be factually insufficient, we do not otherwise discuss appellant's claims that the remaining specifications are factually and legally insufficient.[2] The military judge sentenced appellant to a dishonorable discharge, confinement for fifty-one years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The military judge also credited appellant with fifty-one days of confinement credit against the term of confinement. The convening authority credited appellant with fifty-one days of confinement credit and approved as much of the adjudged sentence as provided for a dishonorable discharge, confinement for fifty-one years, and reduction to the grade of E-1.

We first address appellant's concerns that we have an issue under *United States v. Walters*, 58 M.J. 391 (C.A.A.F. 2003). In announcing findings for two specifications, the military judge excepted out the words "on divers occasions" without explanation. Next, we address appellant's allegation that the military judge should have disqualified himself because appellant alleges he had previously acted "as counsel" in the case. Finally, we address appellant's claim that his civilian defense counsel and detailed defense counsel provided ineffective assistance.[3]

## DISCUSSION

### A. Ambiguous Findings and United States v. Walters

Appellant was convicted of nine specifications. Two of those specifications (Specifications 2 and 12 of Charge I) alleged appellant acted "on divers occasions." For both specifications, the military judge excepted out the words "on divers occasions." That is, the military judge found appellant guilty of the offense on a single occasion and acquitted appellant of all other occasions. As the military judge did not explain his findings, this presents us on appeal with the question of whether we can determine what conduct formed the basis of appellant's guilty finding.

The reasoning behind this dilemma is well-settled and is discussed in depth in our superior court's decision in *Walters*. If the findings are ambiguous, we cannot

---

[2] We do not address in depth appellant's claim that he is entitled to sentencing relief because it took 276 days to conduct post-trial processing. We find no due process violation and do not find the sentence to be inappropriate notwithstanding the time it took to prepare appellant's case for convening authority action.

[3] The matters submitted personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) are either duplicative of the assigned errors or do not merit individual discussion or relief.

perform our duties under Article 66(c), UCMJ, and the specifications must be set aside with prejudice.[4]

As an initial matter, we note Specifications 1 and 13 of Charge I were alternative charges to the conduct alleged in Specifications 2 and 12 of Charge I. The government conceded the specifications were charged in the alternative. At trial, appellant moved to dismiss the specifications as unreasonably multiplied. Rule for Courts-Martial [hereinafter R.C.M.] 906(b)(12) provides for appropriate relief when specifications are unreasonably multiplied for sentencing. R.C.M. 907 instructs on motions to dismiss. R.C.M. 917 allows for the military judge to enter a finding of not guilty based on the insufficiency of the evidence.

Here, the military judge stated his intent to enter a *not guilty* finding to solve an issue of unreasonable multiplication of charges issue–regardless of the sufficiency of the evidence. In other words, even assuming the government proved the specifications beyond a reasonable doubt, the military judge stated he would find appellant not guilty of the specifications. And, indeed, appellant was found not guilty of Specifications 1 and 13 of Charge I. Accordingly, we cannot resolve the *Walters* issue in this case by looking to the alternative charges.

### *1. Forfeiture*

While *Walters* was decided well-over a decade ago, we are unaware of a case that addresses whether a *Walters* issue is forfeited by the failure to raise the issue to the trial judge. In other words, when presented with ambiguous findings, must an accused raise the issue to the military judge in order to preserve the issue for

---

[4] It is curious that the government persists in using the words "on divers occasions" in charging decisions after the Court of Appeals for the Armed Force's (CAAF) decision in *Walters*. "Divers" is an archaic way of stating "two or more." *See* Dep't of Army, Pam. 27-9, Legal Services: Military Judges Benchbook [hereinafter Benchbook], para. 7-25 (1 Jan. 2010) (defining "divers"). As the CAAF made clear in *United States v. Rodriguez*, the *Walters* issue is only triggered when the accused is *acquitted* of certain language by exceptions. 66 M.J. 201, 204-05 (C.A.A.F. 2008). In that case, the CAAF refused to extend *Walters* to circumstances where it may be unclear which instances formed the basis of the court-martial's findings, but where the findings did not include findings by exceptions. *Id*. If the government charged the language "one or more" instead of "two or more," the *Walters* issue would be eliminated, the amount of admissible evidence would be the same, and the accused would continue to receive notice and double jeopardy protection of the charges he is facing. To the extent that charging "one or more" presents disjunctive charging, it is a problem already present when the government charges the conduct happened on "divers" or "two or more" occasions.

appeal?  If forfeiture does not apply, then appellant is under no obligation to raise the issue to the trial judge, and is in fact highly incentivized to do nothing.  Put differently, is a *Walters* issue a bipartite failure of the trial counsel and the military judge, or a tripartite failure also involving the defense counsel?

Absent plain error, an accused forfeits error–even constitutional error–by failing to object at trial.  *See e.g. United States v. Carpenter*, 51 M.J. 393, 396 (C.A.A.F. 1999); *United States v. Powell*, 49 M.J. 460, 463 (C.A.A.F. 1998).  The plain error doctrine incentivizes parties to raise allegations of error at the trial level where it can be most easily corrected.  Here, as we discuss below, appellant's claims turn on how *plain and obvious* it was that there was evidence of more than one offense.

Nonetheless, we infer from our superior court's treatment of previous cases that forfeiture is inappropriate when considering a *Walters* issue.  Accordingly, we assume without deciding that forfeiture does not apply.

### 2.  Standard of Review

On appeal, a *Walters* issue may only be resolved if the record "clearly put the accused and the reviewing courts on notice of what conduct served as the basis for the findings."  *Walters*, 58 M.J. at 396. In *United States v. Ross*, our superior court made clear the standard of review is one of legal sufficiency.  68 M.J. 415, 418 (C.A.A.F. 2010) ("[T]he Government could nevertheless prevail were we to conclude that the evidence was legally insufficient to show that Appellant was guilty" of more than one offense).

Accordingly, we are required to dismiss the specification with prejudice if there is legally sufficient evidence that he committed *more than* one offense.  Whereas if there is only legally sufficient evidence to support one instance, we affirm appellant's conviction.

Thus the topsy-turvy nature of this appeal and the briefs filed by the parties.  The government argues there is clearly evidence appellant only committed the offense on just one occasion.  Appellant, by contrast, argues there is evidence he committed multiple offenses.  Alice has passed through the looking glass.

### 3.  Specification 2 of Charge I

The government charged appellant with multiple specifications based on the location of the offense, the time of the offense, and the nature of the sexual conduct.  Specification 2 of Charge I alleged that at or near Killeen, Texas, between about 1 March 2008 and 8 June 2008, appellant touched AM's breast on divers occasions.

The military judge found appellant guilty only after excepting out the words "on divers occasions."

The *only* evidence regarding the touching of AM's breast in the relevant time frame in Killeen, TX was as follows:

> Q. I want to take you to the hotel room, [AM]. Can you tell me did Sergeant Pasay ever touch you somewhere on your body during the time you stayed in this hotel?
>
> A. Yes.
>
> Q. Please describe what happened?
>
> A. I don't remember the general time. I remember a specific time that I can think of. I was laying on the end of the bed and they were--my mom and Sergeant Pasay . . . and I felt a hand come over and try to grope my breast.

After asking a series of questions that identified the hand as being appellant's and clarifying that her breast was grabbed under her clothing, the trial counsel continued:

> Q. And [AM], was that the only time that you recall someone touching you in the hotel room?
>
> A. I know that there were more times after that, but I can't think of any more specific times.

We find this evidence legally insufficient to support a finding that appellant touched AM's breast on more than one occasion. Had appellant been convicted of the offense as charged, we would be required as a matter of law to except out the language "on divers occasions." AM's testimony that she "knows" someone touched her on other occasions, but cannot actually testify to the other occasions because of a lack of memory, is legally insufficient to support the conclusion that appellant touched her breast more than once. No reasonable fact finder could convict appellant of touching AM's breast on more than one occasion based on this testimony.

### 4. *Specification 12 of Charge I*

In June 2012, AM had turned sixteen years old–the age of consent under the UCMJ. Accordingly, specifications that alleged appellant had sexual intercourse with AM after June of 2012 included an element of force or threats.

Specification 12 of Charge I alleged that at or near Killeen, Texas, between about 28 June 2012 and 1 September 2012, appellant raped AM by force on divers occasions. Again, the military judge excepted out the words "on divers occasions." AM's testimony on direct-examination was that during the relevant time period, appellant had raped her. However, other than the conclusory statement, she never testified about what appellant did that constituted rape. The key portions of her direct exam were as follows:

> Q. And [AM], can you tell us did anything happen with you and Sergeant Pasay when you stayed with him that summer?
>
> A. Yes.
>
> Q. And can you tell us what happened?
>
> A. He raped me.
>
> . . .
>
> Q. Okay, and so [AM], can you tell us where he raped you?
>
> A. He would make up reasons why he needed to leave the house and he would make me go with him, and he would take me to his apartment in Cove.[5]
>
> Q. And what would happen when you came to this apartment?
>
> A. He would make me take off my clothes.
>
> . . .
>
> Q. After you took your clothes off, can you tell us what would happen?
>
> A. He'd penetrate me.
>
> Q. And [AM], can you tell us where he would penetrate you on your body?

---

[5] Copperas Cove, Texas is next to Killeen, Texas.

A. On my vagina.

Q. And what part of his body did he use?
A. His penis.

Q. And [AM], can you tell us how many times this happened?

A. Almost every day.

On review, we find her initial direct testimony was legally insufficient to establish that appellant had raped her "almost every day." While AM's testimony is legally sufficient to establish that she had sexual intercourse with appellant multiple times during the charged time frame, there is no evidence that appellant used *force*. Force is defined as the use of a weapon, the use of physical strength or violence sufficient to overcome resistance, or inflicting physical harm sufficient to coerce or compel submission. UCMJ, art. 120(g)(5). There simply was no testimony about the key element of force.

Perhaps sensing the lack of evidence, the trial counsel returned to this topic on redirect:

Q. During that period of time when you lived with him, were there ever any times that you tried to physically resist or tell him no when he would take you to this apartment?

A. There was *one time* [emphasis added] where [M] and my brothers had went to the pool and to do laundry . . . and he brought me into their bedroom and made me lay on the floor, and he got on top of me, and he asked if he could choke me and I said no, so he put his hand around my neck and said that he wasn't going to squeeze, he just wanted to put his hand on my neck.

Q. And can you tell--Did he actually do that?

A. Yes.
. . .

Q. When he put his hand around your neck, what did you feel?

A. I just felt scared.

Q. And did he squeeze his hand on your neck at all?

A. At that time, no.

Q. Was there anything else happening when he put his hand around your neck?

A. Yeah.  He penetrated me.

Q. . . . And [AM], during the time that you lived with him in that summer, were there ever any other times that he put his hands on your neck?

A. No ma'am.

This redirect-examination provided legally sufficient evidence of only a single occasion of rape.  Accordingly, we do not find the findings to be ambiguous.

*5.  Factual Sufficiency of Specification 12 of Charge I*

The unambiguous findings allow us to conduct our review under Article 66(c), UCMJ.  *See Walters*, 58 M.J. at 395.  We address the issue of factual sufficiency here as it directly borrows from our immediate prior discussion regarding the legal sufficiency of the evidence.  Having now conducted a factual sufficiency review, we find the evidence factually insufficient to support appellant's conviction for rape. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).[6]

---

[6] With regards to the remaining specifications, giving no deference to the findings of the trial court, but recognizing that the court-martial had the ability to see and hear the evidence, we find the evidence to be factually sufficient.  *See United States v. Davis*, 75 M.J. 537, 546 (Army Ct. Crim. App. 2015) ("[T]he degree to which we 'recognize' or give deference to the trial court's ability to see and hear the witnesses will often depend on the degree to which the credibility of the witness is at issue.").  Additionally, appellant testified in this case.  In *United States v. Pleasant*, 71 M.J. 709, 713 (Army Ct. Crim. App. 2012) we stated an accused "testifies at his own peril" and adopted the logic of the United States Court of Appeals for the Eleventh Circuit:

"Most important, a statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt.  By 'substantive' we

(continued . . .)

As related above, when asked if appellant ever "squeezed" her neck AM answered, "At that time, no." There are two possible interpretations to her testimony. The first is that appellant did not initially use force, violence, or inflict physical harm but did so only later during the sexual intercourse. The second, is that appellant may have squeezed her neck during a subsequent assault or not at all. Both interpretations are reasonable readings of the record. Reading the entire testimony in context, the former is the more likely given AM's later testimony that this was the only time appellant placed his hand on her neck. What is missing from the government's case, however, is the follow-up question that would have definitively answered the question beyond a reasonable doubt.

Article 66(c), UCMJ, requires us to set aside a specification when we are not personally convinced of the appellant's guilt beyond a reasonable doubt. Of course, we were not present at trial. Accordingly, this unusual appellate requirement comes with the admonition that we recognize the trial court's superior position in seeing and hearing the witnesses. *Id.* Here, even with such recognition, Article 66(c), UCMJ, compels us to find the evidence of rape to be factually insufficient. Accordingly, we will set aside appellant's conviction to rape in our decretal paragraph and affirm only a finding of guilty to the lesser-included offense of sexual assault by bodily harm.

### B. Disqualification of the Military Judge

Appellant was assigned to a subordinate unit of III Corps. The military judge in this case, Lieutenant Colonel (LTC) Wade Faulkner, had served as the chief of justice (CoJ) of III Corps before becoming a military judge. Lieutenant Colonel Faulkner's time as CoJ overlapped with the time appellant's case was being investigated by Army Criminal Investigation Command (CID). Appellant now asserts LTC Faulkner had previously acted "as counsel" in the case, and was therefore disqualified from serving as the military judge.

---

(. . . continued)

> mean evidence adduced for the purpose of proving a fact in issue as opposed to evidence given for the purpose of discrediting a witness (i.e., showing that he is unworthy of belief), or of corroborating his testimony. . . . when a defendant chooses to testify, he runs the risk that if disbelieved the jury might conclude the opposite of his testimony is true."

*United States v. Williams*, 390 F.3d. 1319, 1325 (11th Cir. 2004) (quoting *United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995)). An accused's testimony that the stoplight was red, if incredulous, can be considered as positive evidence the light was in fact green.

A military judge shall disqualify himself or herself when the military judge has acted "as counsel" in the case. R.C.M. 902(b)(2). Military judges must also recuse themselves when they have "forwarded the charges in the case with a personal recommendation as to disposition." R.C.M. 902(b)(3).

Prior to arraignment, the military judge disclosed to the parties his prior duties as CoJ. He gave a somewhat detailed explanation of his duties as CoJ. With regards to appellant's case, he stated he had no recollection of ever hearing about the case, discussing the case, or otherwise being involved in the case. He further stated he did an email search and found one relevant email. Judge Faulkner further disclosed that he forwarded the email to two trial counsel. Neither party asked any questions of Judge Faulkner. Neither party challenged Judge Faulkner. Appellant elected to be tried by Judge Faulkner alone. On appeal, it is the forwarding of this email that appellant alleges constituted Judge Faulkner as having acted "as counsel."

The email's subject line was "FW: Report of Investigation Status ROI [##]". The entire contents of the email was "Report of Investigation Status ROI [##] has been approved." The status report was included as an attachment, and contained a brief summary of the investigation status. Lieutenant Colonel Faulkner forwarded the email to two trial counsel, Captain (CPT) BG and Mrs. AF, who was a captain at the time, without comment.[7]

### 1. Post-trial Affidavits

The parties have supplemented the record with affidavits from LTC (ret.) Faulkner, the two trial counsel who were responsible for the case pre-preferral, and both defense counsel. We briefly summarize the affidavits from all five individuals.

### a. LTC Faulkner (Former CoJ/Miltiary Judge)

Lieutenant Colonel Faulkner restated his duties and responsibilities as the III Corps CoJ. He also restated that he had no memory of discussing the case or even forwarding the email in question. He further stated he kept a copy of the tracker he used as the III Corps CoJ. The investigation of SGT Pasay was not listed on the tracker. Lieutenant Colonel Faulkner stated he could not explain why it was not on the tracker.

---

[7] For reference, we provide the following dates: The charges alleged appellant's offenses happened between March 2008 and September 2012. Charges were preferred in January 2013 and referred on November 2013. Appellant was arraigned in May 2014. Lieutenant Colonel Faulkner was the CoJ of III Corps from June 2011 to July 2013. The email in question was sent to LTC Faulkner on 12 September 2011 and forwarded to the trial counsel without comment six minutes after it was received.

### b. CPT BG (Former Trial Counsel)

Captain BG was the trial counsel covering appellant's unit from July 2010 until March 2012. He swore he had no recollection of receiving the email in question or any having any substantive discussions with LTC Faulkner about the case. He stated trial counsel generally opined on probable cause without discussing the issue with LTC Faulkner. He could not recall why it took two years after CID completed its investigation to prefer charges against appellant.

### c. Mrs. AF (Former Trial Counsel)

Mrs. AF took over from CPT BG in April of 2012. She swore that when she took over, there was "no mention of the Pasay case. It was not on any of my slide decks. I didn't brief anyone about it. I didn't have a case file in my office." She further explained that the case had not been pursued because the Army had been unable to find AM and her mother. She stated that just before she left Fort Hood in June of 2013, because of a happenstance inquiry, she directed a paralegal to try to locate AM. Her paralegal subsequently located AM, thereby reenergizing the case and leading to appellant's subsequent prosecution and conviction. She does not recall ever briefing LTC Faulkner on this update.

### d. Mr. JJ (Civilian Defense Counsel)

As appellant alleged his counsel were ineffective, Mr. JJ submitted an affidavit. Mr. JJ stated after considering the option of a panel and trial by other judges, he advised appellant that LTC Faulkner was appellant's "best option for a fair trial." He stated he specifically advised appellant that Judge Faulkner had been the CoJ "during the time the case was initially investigated, opined on, and closed out." He stated he discussed it with appellant again leading up to the trial, and appellant "expressed no concern at all."

### e. Major DB (Defense counsel)

Major (MAJ) DB similarly provided an affidavit to respond to the allegation of ineffective assistance. She stated she had explained to appellant her experience in trying "many types of cases" in front of Judge Faulkner, to include allegations of sexual assault, and that she had received positive results. She further explained to appellant her knowledge of LTC Faulkner's prior assignment as the III Corps CoJ. Major DB told appellant of the two prior cases she had where LTC Faulkner's time as a CoJ had overlapped with his judicial duties, and her assessment that LTC Faulkner was a fair and moderate judge. She specifically advised appellant that LTC Faulkner was preferable to the other two judges who would likely preside over the case at Fort Hood.

11

### 2. *Waiver and Forfeiture*

When a military judge has previously acted "as counsel" in the same case, R.C.M. 902(e) provides that the military judge shall not accept any waiver by the parties of the disqualification. That is, the disqualification is "unwaivable." Appellant asserts that because a waiver cannot be accepted, the fact that appellant did not object to LTC Faulkner's prior service as CoJ is of no consequence. We disagree.

Our superior court's decision in *United States v. Jones*, 55 M.J. 317 (C.A.A.F. 2001) is perhaps the closest case on point. In that case, a judge on the Navy-Marine Court of Criminal Appeals had previously served as the chief of the government appellate division. *Id*. at 318. While the case was docketed with the court, the government appellate counsel filed routine motions on the case. *Id*. By the time all the briefs were filed, the same person who served as the head of the government appellate division during the filing of the motions was now an appellate judge deciding the case. *Id*.

Critical to the CAAF's decision in *Jones* was that the appellant had not objected to the judge. *Id*. at 320. Accordingly, the court applied a plain error test. *Id*. The court found it was not plain error when the judge did not sua sponte recuse himself. *Id*. at 321.

Of course, *Jones* involved the potential disqualification of an appellate judge. Here, by contrast, we address the alleged disqualification of a trial judge. While the principles and interests are the same, governing rules do not necessarily follow. However, we are confident that plain error is also the appropriate test in this case. The only authority the CAAF cited for applying the plain error test in *Jones* was *United States v. Schrieber*, 599 F.2d 534, 536 (3rd. Cir. 2001), a case involving the alleged disqualification of a trial judge.

Moreover, the CAAF's decision in *Jones* was consistent with the United States Supreme Court's subsequent case of *Williams v. Pennsylvania*, 136 S. Ct. 1899 (2016). In *Williams*, the appellant specifically filed a motion asking the chief judge of the appellate court to recuse himself because of his prior service as the district attorney who had authorized seeking the death penalty in his case. Had the appellant in *Williams* done nothing, while having full knowledge of the chief judge's prior involvement in the case, it is far from clear the Supreme Court would have still held the appellant was entitled to relief.

Finally, we note that the CAAF's decision in *Jones* is consistent with the requirement of Article 59(a), UCMJ. Absent structural error, which appellant does not assert applies, we cannot reverse a finding based on an error of law unless we find material prejudice to one of appellant's substantial rights. When, as the

unrebutted affidavits indicate, appellant knowingly and tactically selected to be tried by Judge Faulkner, we cannot find prejudice to appellant when he got exactly what he wanted.

### 3. *Vertical Imputation Theory*

Before addressing whether Judge Faulkner acted "as counsel," we first address an issue raised by appellant. In his brief, appellant asks us to apply the vertical imputation theory. Under this theory, the actions of subordinates acting as counsel are attributed to superiors. In other words, if any subordinate acted "as counsel" in a case then the superior would likewise be considered to have acted "as counsel." In this case, this would mean when a subordinate trial counsel offered an opinion as to probable cause, that action would be imputed to the CoJ.

However, in the only CAAF case to discuss the vertical imputation theory, the court rejected it. *Jones* 55 M.J. at 320-21. Admittedly, the court's rejection was not categorical. However, the facts of *Jones* and this case are sufficiently similar that we decline appellant's invitation to blaze new appellate ground and adopt the vertical imputation theory when our superior court specifically declined to do so in *Jones*.[8]

Additionally, R.C.M. 902(a) requires a military judge to recuse himself or herself anytime the judge's "impartiality might be reasonably questioned." That is, R.C.M. 902(a) adequately requires recusal under circumstances where the military judge did not directly act as counsel but, because of a senior-subordinate relationship, a reasonable person might question their fairness. In light of R.C.M. 902(a), adopting the vertical imputation theory to R.C.M. 902(b) as appellant requests would have two effects.

First, it would prohibit a military judge from presiding over a case where the judge's impartiality *could not* be reasonably questioned under R.C.M. 902(a). That is, the only times R.C.M. 902(a) does not overlap with R.C.M. 902(b) is when, under the circumstances, the military judge's impartiality *is not* in question.

---

[8] The CAAF's decision in *Jones* discussed the federal circuits' different approaches to determining judicial disqualification when a former U.S. Attorney is invested as a federal district court judge. 55 M.J. at 319-20. In cases where jurisdictions are clearly delineated by geography and where personnel are relatively stationary, the vertical imputation theory at least has the benefit of clarity. Applied to the Army, in which judge advocates are routinely reassigned every two years and often switch between government, defense, and judicial positions, the benefits are not as clear and the administrative burden may be significant.

Second, by expanding the scope of R.C.M. 902(b), a potential disqualification that an accused could have waived under R.C.M. 902(a) would now be unwaivable. *See* R.C.M. 902(e). While such a reading would expand the opportunity for an appellant to claim error on appeal, it would come at the expense of banning the accused's ability to tactically waive issues at trial.

### 4. Did LTC Faulkner Act "As Counsel"

Based on the record on appeal, we hold that LTC Faulkner did not act as counsel in this case prior to becoming a military judge. The record on appeal establishes the only involvement by LTC Faulkner in this case as the CoJ was the forwarding of an email, without comment, six minutes after it was received.

In *Williams*, the United States Supreme Court stated that due process requires the recusal of a judge when the judge previously "made a critical decision" in the case. In that case, the "critical decision" was to authorize the government to seek the death penalty. Here, by contrast, it is unclear that LTC Faulkner made *any* decision about this case as CoJ, let alone one that was "critical."

However, even assuming that LTC Faulkner's action in forwarding an email was sufficient for him to be acting "as counsel," we fail to find plain error. Such a conclusion is not plain and obvious. Moreover, it is hard to articulate a substantial prejudice to appellant when the unrebutted affidavits of his counsel indicate that both counsel and appellant wanted LTC Faulkner to preside as the military judge in his case. The affidavits attest that there were three military judges at Fort Hood. The tactical assessment of the defense team was that LTC Faulkner was preferable to either of the two other military judges. Additionally, appellant did not merely acquiesce in LTC Faulkner sitting as military judge–he specifically requested it. Pursuant to Article 16(1)(B), UCMJ, appellant personally requested to be tried by LTC Faulkner. Appellant therefore appears to have *invited* the very error he now requests relief from on appeal.

### C. Ineffective Assistance of Counsel

Appellant claims his counsel was ineffective at trial in five areas. First by failing to interview AM and her mother before appellant's court-martial. Second, by advising him to waive the Article 32, UCMJ, investigation. Third, by allegedly providing the government with inculpatory evidence. Fourth, by failing to introduce exculpatory evidence. Finally, by failing to adequately object to inadmissible evidence.

To establish ineffective assistance of counsel, an appellant must demonstrate both "(1) that his counsel's performance was deficient, and (2) that this deficiency

resulted in prejudice." *United States v. McIntosh*, 74 M.J. 294, 295 (C.A.A.F. 2015) (citation and internal quotation marks omitted).

We address each allegation of deficient performance in turn. As we do not find deficient performance, we do not address prejudice.[9]

### 1. Interview of witnesses

Appellant's counsel did not interview AM or her mother before trial. Undoubtedly, these were the two most important witnesses for the government. However, the record of trial and the post-trial affidavits submitted by counsel make clear, the failure to interview the witnesses was not for a lack of trying. AM and her mother refused to be interviewed. As we stated in *United States v. Guardado*:

> Article 46, UCMJ governs compulsory process in courts-martial and states that "[p]rocess issued in court-martial cases to compel witnesses *to appear and testify* and to compel the production of other evidence shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue . . . ." 10 U.S.C. § 846 (2012) (emphasis added). In other words, by its own terms compulsory process is limited to producing witnesses to "appear and testify" and does not include a requirement that the witness first agree to be interviewed. Additionally, a military court cannot exercise greater authority in this area than the "courts of the United States."
>
> While Article 46, UCMJ, also states the "trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence" we do not believe this can serve as a basis to compel interviews. First, the language specifically limits itself to the ability to "obtain witnesses." Second, the provisions in Article

---

[9] Broadly speaking, appellant does not address the prejudice prong in his brief. While appellant explains why he believes his civilian defense counsel was deficient, there is no substantial attempt to link this to a prejudicial effect at the trial. For example, while appellant alleges that his counsel should have interviewed witnesses, he does not explain to us (as is his burden) what the interviews would have accomplished, or how they may have altered the course of the trial. It may be *deficient* to not try to interview an important witness pretrial, but it is only *ineffective* if that interview would have revealed something of consequence.

> 46, UCMJ, apply equally to the trial counsel, the defense counsel, *and the court-martial*. That is, whatever the parties' rights under the first phrase of Article 46, it is shared by the panel members. *See* UCMJ, art. 16, 10 U.S.C. § 816 (2012) (definition of a court-martial). While the court-martial may obtain witnesses to testify, the panel members cannot conduct pretrial interviews of witnesses.
>
> . . .
>
> The counsel, like the military judge, lack the authority to compel a civilian's cooperation in pretrial interviews. A witness may refuse to be interviewed notwithstanding a counsel's desperate pleas. Absent compulsory process, a witness maintains the free will to determine the degree to which he or she voluntarily participates in the court-martial.

75 M.J. 889, 904 (Army Ct. Crim. App. 2016) (pet. granted on other grounds by *United States v. Guardado*, No. 17-0167/AR, ARMY 20140715 (C.A.A.F. 3 March 2017) (order)). As we find no authority for a defense counsel to compel the cooperation of an unwilling witness to be interviewed, we cannot find counsel's performance was deficient.

### 2. *Waiver of the Article 32 Investigation*

Appellant next asserts his counsel were deficient when they advised him to waive the Article 32 investigation. The affidavits submitted by counsel adequately establish this advice was based on two concerns. First, counsel feared that at an Article 32 investigation appellant would face the additional charge of obstruction of justice stemming from his alleged disposal of a laptop computer. Second, counsel believed there was a very good chance AM would not be available to testify at trial. AM had been a reluctant government witness and the government had at one point been unable to locate her. If AM testified at the Article 32 hearing, because her testimony would be preserved under oath, her Article 32 testimony could be introduced in court. *See* Mil. R. Evid. 804(b)(1) (hearsay exception for prior testimony of an unavailable witness). Appellant's military defense counsel submitted, as an attachment to her affidavit, a memorandum for record that contemporaneously documents these concerns and the discussions with appellant. Finally, the colloquy between appellant and the military judge compellingly demonstrates that appellant's waiver was voluntary.

### 3. *Providing Inculpatory Evidence to the Government*

In the midst of trial, the defense asked for a one-hour recess so they could, in part, print a Facebook text conversation between appellant and AM. Defense counsel stated they needed to print the conversation to use "in cross-examination of [the next] witness" and to make sure "the government gets them." The defense's cross-examination of AM included getting her to admit the favorable things she had said about appellant in the conversation. As AM readily admitted the statements, the printout of the conversation was not used for impeachment.

To briefly summarize, the Facebook conversation is a discussion about where AM and her mother should live. In general, the conversation is friendly and favorable to appellant as AM seeks appellant's advice about how to convince her mother not to move to the east coast. AM also expresses a desire to live close to appellant. However, the conversation does include the admission of appellant that "if things go bad" with AM's mom and "you guys [become] homeless," AM could live with appellant even though "i know im the last person u want to live with."

The government marked the text exchange and used it in their cross-examination of appellant. The government did not admit the evidence. Appellant now claims the government became aware of the conversation only because appellant's counsel used a prosecution printer to print out the exchange. We find no deficient performance.

### 4. *Failure to Introduce Exculpatory Evidence*

As just discussed, appellant alleged his counsel were ineffective when they allegedly gave the trial counsel a copy of the Facebook conversation. Appellant also alleges his counsel were ineffective for not introducing into evidence this same Facebook conversation. That is, appellant argues–with regards to the same piece of evidence–that his counsel were ineffective in providing it to the government because it is clearly inculpatory *and* that counsel were ineffective for not introducing the conversation because it is exculpatory. We need not further explain the illogic of this argument.

### 5. *Evidentiary deficiencies*

Appellant combs the record and lists numerous evidentiary objections or decisions by counsel he alleges constitute deficient performance. The alleged deficiencies include hearsay objections not made, prior consistent statements that were made before the defense raised the issue of recent fabrication, and similar issues. The issues defy easy summarization. However, having reviewed each issue, given the strong presumption that counsel are competent, and the requirement that our scrutiny of the performance by counsel be "highly deferential," we do not find

deficient performance. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Even more clearly, we also do not find that appellant has met his burden of establishing prejudice.

We "do not assess trial defense counsel's performance through the prism of appellate hindsight and then apply our subjective view of how we think defense counsel should have conducted the trial." *United States v. Akbar*, 74 M.J. 364, 386 (C.A.A.F. 2015). Gambles may not pay out, a defense strategy may fall flat, and decisions earnestly made may look unwise once one has the benefit of knowing the verdict. To be sure, a witness's answer to a question may be hearsay. But trials are fluid events. Counsel must weigh the benefit of an objection against the risk of the opposing counsel's response and the change in the trial's trajectory. Counsel at trial are not reading a cold transcript. They see and hear the witnesses, and they can observe the effect of the testimony on the fact finder. Often, a trial has a feel to those in the courtroom that will not be adequately reflected in the transcribed record. Whether to object to testimony is not merely a matter of evidentiary rules. Objections may highlight evidence a counsel assesses is best left without emphasis. And, objections allow the opposing party to respond. There is little to be gained by objecting to hearsay if the government's response is to lay a foundation for an exception that bolsters the weight of the evidence.

## CONCLUSION

The court affirms only so much of the finding of guilty of Specification 12 of Charge I as finds the appellant:

> Did, at or near Killeen, Texas, between on or about 28 June 2012 and on or about 1 September 2012, commit a sexual act upon AM, to wit: penetrating with his penis, the vulva of AM, by causing bodily harm to AM.

The remaining findings of guilty are AFFIRMED.

We are able to reassess the sentence on the basis of the error noted and do so after conducting a thorough analysis of the totality of circumstances presented by appellant's case and in accordance with the principles articulated by our superior court in *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013) and *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986). We are confident that based on the entire record and appellant's course of conduct, the military judge would have imposed a sentence of at least that which was adjudged, and accordingly we AFFIRM the sentence.

PASAY—ARMY 20140930

We find this reassessed sentence is not only purged of any error but is also appropriate. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by our decision, are ordered restored.

Senior Judge MULLIGAN and Judge FEBBO concur.

FOR THE COURT:

JOHN P. TAITT
Deputy Clerk of Court